Thank you. Good morning, your honors. May it please the court and opposing counsel, my name is Rex Elliott and I represent the appellant in this case, honored to represent her, Ginny LeFever. I have asked to reserve two minutes of my time for rebuttal. Ginny LeFever was denied her constitutional right to a fair trial, that's the issue in this case, and as a result, she spent 22 years of her life in prison. It's important to understand that at the trial court level, despite evidence of a suicide, Ginny LeFever was convicted largely on the testimony of the Franklin County toxicologist, James Ferguson. Mr. Ferguson, in an effort to demonstrate that this wasn't a suicide, concocted this wild theory of substances being administered. I wanted a wild theory, counsel, but we both know that the district judge who tried her was unconvinced of any innocence here. That is true. The murder of her husband. That is true, your honor. That the trial judge, it was a trial to the bench, and Judge Wiest, after the evidence came in, convicted Ginny LeFever based largely on the testimony of the toxicologist who had a theory that toxins were ingested, administered through the rectum. Well, that was one part of the theory, but that's not what he died from. He died from another drug that was introduced through injection. Well, there was substantial evidence. But then there was also evidence that not only did he have that, but he had other things in his body. Well, there was evidence that he had the amitriptyline evidence. Nobody could demonstrate for certain that this was not ingested orally. Mr. Ferguson obviously had this theory that it was injected and it leaked out over a period of time. That's not the issue that we have here. Mr. Ferguson was the only witness to confirm substances of arsenic and strychnine. That's his job, toxicology. It is his job, but what happened, your honor, is at the end of the day we have established that Mr. Ferguson is, frankly, was at the time a fraud. You say this, but he had a guy with 20 years experience in toxicology, had done it forever. The challenge, we both know what it is, it's that he lied about his graduation date. He lied about his qualifications to testify as an expert at trial, your honor. To the extent that he said he graduated at one point early in his career and he didn't actually obtain that degree until more than 10 years later. That's correct, your honor. He had testified in hundreds of criminal cases that he had gotten his Bachelor of Science at Ohio State in 1972, and he also testified that he had graduate school. When in actuality he had such a poor undergraduate record, he wasn't able to obtain his degree until the late 1980s. The question here is whether Mr. Ferguson's undisclosed prior acts of perjury in hundreds of criminal cases before Jenny Lefevre, whether that was sufficient. We never say that he's perjured himself with respect to the toxicology at hand. It was with respect to his graduation date. That is correct, your honor. However, one of the most important things in any trial when you're examining an expert witness is to cross-examine that expert's qualifications. What we have here is an expert who had demonstrated a propensity to lie under oath. He is the only witness at trial that could establish these substances in Mr. Lefevre's body, and he's the only witness that could testify that they came in through the rectum. In fact, it had a major impact on Ms. Lefevre's conviction. The trial judge in vacant... Well, excuse me, counsel, but he was cross-examined about that. He was not cross-examined about his qualifications? No, no, no. I'm talking about the scientific basis for the charge that this was a homicide. He was thoroughly cross-examined about all of that, all of those findings that he made that had a scientific basis. He certainly was cross-examined about those issues, your honor, but what was absent from this trial is cross-examination over the fact that he had lied in other criminal trials. But really, is this even relevant to this claim? I mean, the judge found it was a Brady violation, right? Yes. And so the question has to do with who can be liable under 1983 and... Exactly, your honor. I do believe that this is a Brady violation. The court in the Westfield case indicated that even the failure to disclose a single prior act of perjury is Brady information. But doesn't the perjury have to be about something connected to the trial and not about the date of your... I know you're shaking your head, but come on. If the jury had known that and had known he had... And he'd been asked about all the times he had said, yes, I graduated in 1972. It's a fair question, your honor, and the issue is not so much, did he not disclose information relating to the scientific issue, and I'll get to that in a second, because he didn't. But on this issue of his qualifications, the criminal case was tried to the bench, to a judge. That same trial judge, 22 years later, vacated the conviction on the grounds that this witness had lied hundreds of times in other criminal trials about his qualifications. We don't know what all went into Judge Weiss, the fact that she served 22 years, that there was... Well, that's true, your honor. However, in the entry vacating the conviction, he made it clear that Mr. Ferguson was the linchpin for the state's entire case. Without his testimony, the state's case fell apart. And Judge Weiss said, absolutely, that the issue here is fairness. Did she have a fair trial? And Judge Weiss vacated that conviction based on the fact that she did not have a fair trial because the key witness in the case was a demonstrated liar. Now, here, your job is to convince the Court of Appeals that what was withheld, graduation date, we always throw it in there, because it sounds much worse, perjury, but what was withheld was material and exculpatory, or had some significant value for impeachment. That's correct, your honor. And that's where, I don't know, I think some of us might struggle with that. I believe that we can have some solace in what the trial judge that presided over the case said. The trial judge didn't say, she didn't get a fair trial because he didn't tell me his true qualifications. He said, she didn't get a fair trial because he was a proven liar. And I think we have to go back to the fact that it was only Mr. Ferguson that had created this theory that these toxins were administered rectally. And so, I would submit, at least on the evidence of the prior acts of giving false testimony in hundreds of criminal trials, that that not only would have had a significant impact at Ms. Lefevre's trial, but the trial judge who convicted her told us that. Significant as in, he would have not been, she wouldn't have been convicted. I believe that's... That's what we need. It has to be exculpatory. Well, it is. I believe it is exculpatory and impeachment evidence. And I think that it's hard to come to the conclusion that the trial judge that presided over the case found it to be so important that he said so. Well, you know, you keep saying that, but we know. Yes, Your Honor. He also said some other things. That's true. He did say that he still had questions about guilt or innocence, but he also said that the case, the state's entire case fell apart. And that's what we're talking about here. Did she get a fair... Let's talk about qualified immunity. Yes, Your Honor. Okay. So obviously the testimony at her trial is absolutely immune. You agree with that? I believe that this court said that many times, yes. Okay. So... Do you want to argue the dime store novel, so-called dime store novel? There are other... Yes, Your Honor. There are other categories of evidence that were withheld. One is this manuscript by Mr. Ferguson, a book that he had written before the trial. Every one of the defendants in this case has testified that the job of a government investigator is to be neutral and to report the facts without passion or prejudice. The reality is that this manuscript found its way not only to the coroner, because Mr. Ferguson testified that he thought it was the coroner's official business, but also it found its way into the police file. And this evidence was not turned over to the prosecutor. Had it been, it would have had an... It was clearly impeachment material to show that Mr. Ferguson had a vested interest in the outcome of the trial. To hope to show, right. To hope to show, Your Honor, yes. And then there are other categories of evidence as well that were withheld, Your Honor, that I would submit... We've been talking about the prior testimony in criminal cases and the manuscript. That is more in the impeachment category. The exculpatory evidence category are the opinions of Mr. Ferguson, the county coroner, and the pathologist that were not disclosed prior to trial. And this is where I get a little confused. You're saying... I mean, they testified to certain things at trial. We have no reason to believe that they have a different opinion. And then 22 years later, you have them saying something else. And does that mean that 22 years earlier, there was some sort of document that you should have been given? I don't understand. Well, we were given documents 22 years earlier that said something different. But in their depositions, they testified, granted, Your Honor, 22 years later, that... Well, you're talking about the graduation date, not the novel. I thought Judge... No. I'm talking about the opinions. Yes. I'm talking about the exculpatory evidence. At their depositions, they testified that they held these opinions back in 1988 and 1989 before Ms. Lefever's criminal trial. So for instance, let me give you an example. Dr. Raker had the opinion, he is the Licking County coroner, that arsenic would have entered Mr. Lefever's system through his mouth. It would have entered orally. He also testified that he had the opinion back then that strychnine could not have... You could not determine how it got into Mr. Lefever's body. The death certificate that Dr. Raker signed indicated that arsenic and strychnine had entered his body rectally. If that information had been disclosed, those medical opinions back in 1988 and 1989, they certainly would have been used at trial to impeach or to attack this notion that these toxins were administered rectally. What is the Brady duty? I believe the Brady-derived duty... This court in Moldowan made it clear that members of the prosecution team, police officers, forensic investigators, have a duty to disclose either exculpatory evidence or evidence that can go to the impeachment of a critical witness. I believe that Brady-derived duty, Your Honor, very simply put, puts an obligation on the prosecution team to disclose to the prosecutor evidence that could be favorable to the accused and that would impact her right to a fair trial. What do you define... How do you define evidence? Exculpatory evidence or impeachment evidence. That's not what I mean. If somebody has a thought, never put on paper, it's a thought, it's a consideration, it's an opinion, do all of those things have to be placed on paper and then handed to the defendant that, you know, last Tuesday I was thinking and it occurred to me that maybe somebody else could have done the act. I don't believe that that's the obligation. However, what we have here is a theory presented by the state that these toxins were administered rectally. Well, let me just see if I understand this. That wasn't something that... There's no evidence that the toxicologist came up with that theory because he was trying to railroad this woman into prison. He came to that theory because there was none of that substance in the blood, in the victim's blood when they ran the autopsy or ran the blood test. And so then you say to yourself, well, if he'd taken it in orally, it would have gotten into his bloodstream. And since it didn't, my theory is that it was introduced rectally. The fact remains that that stuff was in him. You know, however it got there, somebody or the victim himself had introduced it one way or another and all there was was a difference of opinion as to how it got into his body. I would say that that's true and the only evidence for these toxins being in his body comes through the toxicologist. There was no confirmation of that. But the... I think if he lied about his qualifications for two decades, Your Honor, that... Lied about the science. Okay. We need to wrap it up for now and you saved some time, I hope. Thank you, Your Honor. I think you did. Your Honors, my name is Gordon Shuler, appearing here on behalf of James Ferguson. I would like to reserve seven and a half minutes, not for me, but for counsel for other defendants, just to split our time. So make me sit down so I don't take up all his time. You will. I'll do that for you. I think there's a real issue here about the issues before the court today and I just want to make it clear that the district court said in its decision, in light of the court's ruling that Ferguson is entitled to qualified immunity, the court need not determine whether the evidence he allegedly withheld from the prosecutor was exculpatory material within the meaning of Brady and its progeny. I'm not real happy with that at this point because I think we should maybe talk about materiality and all that, but the district court did not reach that question. What the district court said was this toxicologist didn't have the constitutional obligation back in 1988 and 1990. And so we have to go through, and I won't go through all of them, but in the... to find him liable, it had to be clearly established in 1988 and 1990 that he had this duty. At that time, it was not, and that's what the district court found. And we can parse words forever and we've all written... Was it not clearly established that the duty extended to a toxicologist, or was it not clearly established that you can't lie on your resume? Well, there's no other case involving lying on a resume, but what the cases are about prior to that date, each and every one of them, if you read Spurlock and Gregory and those cases, they all relate to intentional fabrication of evidence by police officers. We don't get to the first forensic examiner until Gregory in 2006. That's the first case that says that. Okay, so what do you do about our cases that have found Brady violations preceding 2006 by examiners? We... Apparently, this court has relied on Gregory to say, well, because they said in Gregory, we can go back to 1989, 1990, because that's when the events occurred in this case. But in Gregory, actually it was 1992, but they involve the intentional fabrication of evidence, as do the facts in Spurlock, which was a sheriff's deputy that made a false video that paid a witness to convict an innocent man. Nothing like that happened in this case. Nobody intentionally falsified the scientific evidence that was presented. When you just put in the word scientific, I think all the cases recognize that impeachment evidence is important. It's very important. It can be. And this person withheld the fact that he had been lying about his credentials for the last however many years. That, in our view, is not material. What is material is that he lied under oath at this trial. He said my graduation date was 1973. It had nothing to do with the substance or the merit of his testimony. Well, I don't think you're going to find cases that say that credentials are not material. I think that you might in an instance such as this, when a forensic toxicologist is not required to have any particular credentials. But you're still... You can be one without having a college degree. And he's been doing it. He testified that when he was in college, he was working at BCI, and he was testifying in cases, in drunk driving cases. He's been doing this his entire adult life. And the only thing that he didn't do in terms of graduation, he was one hour short. And he was told the day before he graduated, you're not going to graduate today. He had a wife and a child and he was working and he didn't go back and get that out. We said it mattered to him. It did matter to him. And she was granted a new trial and it was dismissed without prejudice. It's a murder case. She could still be retried. But for the passage of time, I can't speak for the county prosecutor. I don't know that I would want to try to try this case 22 years later again. It would be extremely difficult. Well, I think that we've seen the result of that. There's been no retrial. No. And I don't think, I think that we can infer that that is because we don't have witnesses spayed, memories spayed, evidence is gone. I want to go back to something that the appellant said, just to make sure we cover this. And that is the idea that Ferguson was the only one that testified or had anything to do with rectal administration of the arsenic and the strychnine. In the first place, as you pointed out, the cause of death was the amitriptyline poisoning. The arsenic and the strychnine were not the cause of death. But, and in the grand jury when she was indicted, the testimony about rectal administration of these poisons was not presented because we didn't know it yet. What happened is Dr. Fartle, who's an MD and who was on the deputy coroner for Franklin County, sent additional lab samples from the body of the decedent. That's where this evidence comes in. Mr. Ferguson's job then is, he opens up, I wouldn't want to do this job, but they're in a sealed package and he reviews the contents of the rectum, the colon, and he finds strychnine and arsenic. And he testifies that there's not much arsenic, there's no arsenic in the blood. He later does some hair samples and says, well, that would have had to have been just a long time ago. That was in all likelihood oral. But the fact that this was administered rectally is corroborated by Dr. Fartle, who says, hey, I'm going to send this stuff to you because I see these little white flecks. That's how we get to this. I'm sorry. Did Fartle detect? He didn't know what it was. He found something. In the rectum, colon, that were small white specks, I don't know what these are, sent them to Ferguson. He did the testing. And he's the only one that did the testing. That's all counsel said, that he's the only one that said that there was arsenic. That's all he said. That's right. But I want the court to understand where he didn't make up, well, it must have been administered rectally out of thin air. He found it there. There's much more substance to that testimony. It's also important that Mr. Ferguson was supervised by Dr. Curry, who's a Ph.D. at Ohio State in toxicology, pharmacology, and that all the reports that Ferguson submitted to the prosecutor were signed by his supervisor, Dr. Curry, who knows what he's doing, who supervises Ferguson Worth, and had done so for 20-plus years. That's how that comes down. There's a lot more in this case, and you've read a large pile of briefs, as I was doing this week, since it's been a long time since we wrote them, and I'll stop to give my co-counsel. Thank you, Mr. Shulman. Thank you. Good morning. My name is Andrew Yasowitz. May it please the court, I represent Dr. Raker, and I'm also arguing on behalf of Newark Detective Ballantyne. I wonder what you think, Mr. Yasowitz, about the argument regarding Raker by the appellant here that Raker bore a different opinion about the administration rectally. Okay, so there's two parts to that, because they've alleged... There's a deposition where it goes back and forth. How do you read that? So the first part is, so Dr. Raker stated at deposition, in response to some questioning from plaintiff's counsel, that he believed that arsenic was taken orally, and it was. That was always part of the state's theory, that arsenic was taken orally. In fact, they didn't know why, they didn't know how at the time. We now know that... Did he disavow, did the questioning actually cause him to disavow Dr. Ferguson's theory about rectal administration? Not at all, and that's why what we put in our brief is, when he was reading the death certificate and plaintiff's counsel asked him, do you agree with everything that's in there? And he said yes, and then he said it again later in the deposition. He was a 78-year-old man testifying 22 years later, and he may not have testified perfectly, but he was pretty clear that he believed in all of the opinions that he had written in the death certificate. Moreover, the evidence supports rectal and oral administration of arsenic. And as I was saying, they didn't know at the time how the oral administration of arsenic came, but we do now, and it's in the record at 96-8, Ms. LaFever's daughter, Heather Reynolds, has testified in this case that she witnessed Ms. LaFever mix arsenic into William's orange juice and stated that she was going to cause William a slow death. We know that now. But Dr. Raker never held a contrary opinion to Mr. Ferguson, as plaintiff suggests, and the plaintiff in this case talks about concocted evidence. That's not an issue before the court. That was an issue in discovery, it was raised on summary judgment, and they abandoned all of the fabrication claims, all of the concoction claims. And this court, in its previous opinion, said LaFever offers no evidence contradicting the toxicology reports. And that's true, and we've put in our brief, in a table, all of the evidence which supported oral and rectal administration of arsenic and strychnine. And those are the opinions that Dr. Raker believed, and he was relying on Mr. Ferguson. I did want to go back, Judge White, you raised the issue about what was clearly established in 1989-1990, and it was not clearly established that there's not one Supreme Court case or Sixth Circuit case which held, at that time, that police officers or coroners could be disclosed impeachment evidence, not evidence of innocence, and I think that's something different. In fact, in Muldowen, the court stated that this was the first time the Sixth Circuit was addressing the issue, and what Muldowen did was go back and say, well, if we go back through some of our cases, it's clear that there's some duty on the part of police officers and forensic investigators to provide exculpatory information, and what was clearly established at the time, and rightly so, is that you can't fabricate evidence, and you can't deliberately withhold evidence of innocence. I mean, all of the cases, when they say, when the plaintiff says, this goes back to 1964, they're referring to Barbie versus Ward in Maryland Penitentiary. I mean, that was a case where the police failed to disclose that fingerprints in a getaway car following a police officer shooting did not match the defendant. The bullets that the defendant, the bullets from the shooting did not match the defendant's gun. You know, Jones versus City of Chicago, they based a prosecution, an assault prosecution on an ID made by a child with a severe head injury, and then when another detective uncovered exculpatory evidence, they buried it, literally buried it in a drawer. So, you know, Gregory versus City of Louisville, a forensic investigator in that case withheld existence of hairs, which did not match the suspect. We were never arguing that evidence like that would not, it would not be clearly established that an investigator had to turn that over. The evidence, certainly against Dr. Raker and Detective Ballantyne, is not anywhere near, it's not even in the same ballpark as that type of evidence, and you know, you look at the book, Angel of Mercy, Angel of Death, if Dr. Raker and Detective Ballantyne even had it, which is disputed, I mean, that book, it relates the investigation and evidence leading up to plaintiff's arrest and why she's guilty of murdering her husband. It would not have been reasonably apparent to a coroner or a detective, even if you assume that they had it, that they needed to turn that over. That was indicative of the defendant's innocence. The Nickerson statement against, they alleged that Detective Ballantyne had a third statement from Susan Nickerson, you know, the district court summed that up. Even if you believe that, I mean, there's scant evidence that there ever was a third statement. Even if you believe that, all it shows is that William Lefevre wasn't injected or may not have been injected with a syringe that came from her work. That doesn't prove her innocence, and even their expert in this case agreed that there was a non-therapeutic injection that he could not explain. My time is up. One question. Sure. What about the son's claims? I'm sorry? Did you want to say anything about the son's claims? Oh, the son's claims. Very briefly, Alex Lefevre, there's two things. You'll note that we don't believe that the court has jurisdiction to hear his appeal because he didn't specifically appeal Judge Frost's order dismissing his Section 1983 claim. He specified the orders he was appealing, and Record Entry 80, which was the order that Section 1983 claims, was not among them. Second, as we stated in our brief, there's been no Sixth Circuit case which has ever held that a family member has a Section 1983 claim for an alleged constitutional tort committed against another family member, and we go through almost every circuit. Almost every circuit agrees with that. The most recent cases from this circuit would be Claybrook v. Birchwell and Foos v. City of Delaware, where this court specifically said there is no claim for a family member when someone else is injured by a constitutional tort. Thank you. Thank you, Counsel. Thank you, Your Honor. Just briefly, Judge White, you asked a question about the mental impressions of witnesses in the Muldown case. The forensic investigators involved were dentists. They were medical experts, and one of the issues there was that a dentist testified at trial and failed to disclose the prior medical opinion that conflicted directly with the testimony she gave at trial. So that's the type of evidence that I believe would need to be disclosed under Brady. I'd just like to briefly deal with clearly established. Under the court's Muldown case, I would submit that both Muldown and Gregory have indicated that this court does not view police officers and forensic investigators differently. They are all part of the prosecutorial team. This court then pointed – The district court decided this on the clearly established prong, and your challenge, your best argument against that is what? That it was clearly established as a – By virtue, yeah. By virtue of Muldown pointing back to the police officer cases, pointing all the way back to earlier police officer cases, and this court's decision in Elkins versus Summit County where this court made clear that not only was as clearly established as of April or May of 1990, but could have gone all the way back to 1964. At least as early as April or May doesn't really correspond to when it was clearly established. It corresponds to the actions in the Spurlock case itself. The central question here is did Ginny Lefevre receive her constitutional right to a fair trial? And I would submit, your honors, that it truly, if you look at the hundreds of acts of prior perjury that was committed by Mr. Ferguson that was not disclosed, the Westerfield case is right on point, and it makes clear that one prior act of perjury can in fact interfere with the defendant's right to a fair trial. And I would submit that under Brady, it's hard to imagine a clearer case where you have a key government witness that really is the entire government's case against Mrs. Lefevre, and he doesn't disclose that he's perjured himself hundreds of times. And if we want to ask was that material, we have the judges. The judge who convicted her, his own words, and he has told us that it was not only material, it denied her the right to a fair trial. So we would ask this court to remand, and actually because the facts are not in dispute, we'd actually ask you to enter judgment, partial summary judgment on the Brady claims in Ms. Lefevre's favor. And what about your other client? Alex Lefevre is represented by Mr. Mordarski. We think the briefs are very clear, but your honor, I would submit to you that Alex Lefevre I don't think there's any case on point in a wrongful conviction case where one way or another a child asserts his right. But I would say that the constitutional right to family unity is so critically important. So he's asserting his own right. He is asserting his own right. He was directly constitutionally affected by the actions of the state in convicting his mother. His entire family was ripped apart. He was put into foster homes. He was directly affected. Thank you. Thank you, your honors. I appreciate your arguments today, and we will consider the case carefully.